Oyez, oyez, oyez. All persons having business before the Honorable, the United States Court of Appeals, for the District of Columbia Circuit, are admonished to draw near and give their attention, for the Court is now sitting. God save the United States and its Honorable Court. Be seated, please. Case No. 17, District 265, et al., United States of America v. Dynamic Visions, Inc., doing business as Dynamic Visions Home Health Services, et al., appellant, Mr. Iwamizu, for Appellant Dynamic Visions, Inc., Mr. Bogum, for Appellant Dynamic Visions, Inc., and Ms. Lopez for the appellate. Good morning.  You may proceed. Thank you. for false POCs, but these are POCs that were signed by the doctors. So we waited. They went to court, and the judge told them that the claim for civil award was not possible because they had no supporting documents. So on the 4th of April, 2015, the investigators decided to institute another investigation. So they went down to the medical doctors. They called Dr. Awa, Dr. Matthew, and Dr. Schultzberg and told them that they wanted them to verify some POCs and tell them if these POCs were valid or not. So they faxed the POCs to these doctors. Dr. Awa received his on the 7th of April. On the 8th, he called them on the phone and told them that the three POCs that were with him, he realized that his signature was only on one. But in the end, he told them that he realized that in 2008, somebody complained in his office that one of his employees was signing POCs in his name. They did all this investigative report on telephone. So they were in their office and taking notes of what the doctors were saying. But what happened is that when they wrote the report in April, they did not send the results to the court. They waited until November 2016. Then they created a new report. And in the new report they created, they did not write exactly what the doctors had told them to write. So they kept the report that they wrote in April and just drafted something and sent down to the doctor after 19 months. So the doctor just signed and sent them back to them. So with that document, since the judge had did a summary ruling and put in abeyance… Mr. Bonobu, if you notice, the red light is on, so you've used all your time. So we'll now hear from Mr. Iwanogi. Thank you very much. I'm out of my time? Yes, you're out of your time. Thank you. May it please the court, Judy Iwanogi on behalf of the appellant, Dynamic Visions. The broad issue in this case is whether the district court erred by granting summary judgment to the government at the stage of the proceedings that we're aware of. This is a false claim case, and as this court recognizes, false claim essentially boils down to knowledge of the falsity and materiality of the alleged falsity. And based on the record before the district court, there was insufficient and clearly disputed evidence before that court for the court to make a finding that there was no dispute and that summary judgment was required or was necessary at that point. And when it comes down to the issue of knowledge, the question becomes whether Dynamic Vision acted with knowledge of the falsity as required for liability to attack. And that is an evidentiary question, and courts look to the totality of the circumstances, and this cannot be done at that summary judgment stage. Especially in a case such as this, where the district court was aware that this case actually was taken before the grand jury, the grand jury could not find anything and did not even come down with an indictment. The court essentially relied on an investigative report, which as the record shows, kept changing as we went on. But the district court, in essence, pretty much weighed the evidence. Because if the court looks at what the court said, at some point, in order for the court to base knowledge, the court said that at least the employees of Dynamic Vision should have been aware that they ignored signs. So using that, it's possible that they should have known. So the court, in essence, went into weighing evidence contrary to what this court knows that the ruling in Celotex requires, that the court is not supposed to weigh the evidence in order to make that determination. But however, the district court gave the government, well, after the initial review of the pleadings by the court, the court determined that it didn't have enough, and then gave the government another bite at the apple, that they should go down, seek information. And as Mr. Bungum stated, the government essentially prepared affidavits, faxed to doctors, doctors came back, and then the court just went in. Without making the necessary inference, the court basically was saying that the appellant, Dynamic Vision, did not dispute the facts that were presented. As I understand it, one of the concerns that the district court had was that you've never introduced valid plans of care supporting all of the claims in question. Well, you know, there were valid plans of care. The issue boiled down to whether, one, the plans of care were forged, two, whether the plans of care were signed after the six-month period, which is what was required by the Medicaid statute and the regulations. So the issue was, it was the burden of the government to produce records to show that this were, in fact, forged plans of care or that the claims that were presented by Dynamic Vision. We'll ask the government about the forgery claims. But what I'm getting at is, as far as I can tell, for the record, you never produced valid plans of care in support of all your claims. There are a lot of the claims that you had no valid plans of care to offer. Well, you know, there were valid plans of care because this was a big, I mean, there were thousands and thousands of claims that were presented. The government did an audit, picked 25 out of the 25 that said some of them, that the plans of care were signed beyond the time period and that some of them were unsigned. But there were plans of care that were presented. The issue was whether the plans of care complied with what they required. And unsigned plans of care don't comply, right? Well, an unsigned plan of care will not comply based on the statute. However, the issue still boils down to, was that part of the claim or was that the claim that was presented before the court? And if they were not signed, that particular issue, just like the court recognized in that scope, that it's a fact-by-fact basis. Each claim is independent of the other. They are not the same thing. But the court, the district court, grouped it and, in fact, found it. Well, if the district court, if you've got 25, if you've got an audit of 25 claims and none of them has a valid plan of care, that's not sufficient for the district court to conclude that there's reckless disregard of whether the claims are being submitted with the proper documentation? Well, that's the issue, Your Honor. Not all of them were related to no signature. Some of them had signatures. The issue was whether the signature was valid. Well, that's why I used the phrase valid plans of care. Yes. They are defective in various ways, not just one way, in various ways. Your Honor, that's the issue. It comes down to, if you say it was defective, how do we determine it was defective? That was why this case was required, to go to a find-off fact to determine if it was, in fact, defective. Just like Dr. Mato said, that he and other doctors, and in his practice, which is what happens with Medicaid claims, that other doctors can sign. Once it's a practitioner who signs it, it becomes valid. It doesn't become invalid just because it wasn't signed by the actual doctor who is this person's physician, another physician, just like in my office. Okay. Now, I notice you didn't ask for any rebuttal time, but we'll give you some back. But before, I'll ask my colleagues if you have any questions. Okay. We'll give you some time back on rebuttal, but we'll go down here from the government. Thank you very much. May it please the Court, Caroline Lopez on behalf of the United States. Plans of care are the way that D.C. Medicaid determines whether the services it's paying for are medically necessary. And here, I just want to back up to the big picture first before addressing specific questions. I just want to emphasize that there's absolutely no dispute here that this requirement of valid plans of care, as Judge Griffith was discussing, is material, and that if you submit a claim without a valid plan of care, it's false. This is just about scienter, right? No, Your Honor, and I think it's helpful to walk through the five different types of issues that there were here, and to talk again as well about the percentages. But the issue on appeal, as I understand it, is whether the district court properly granted summary judgment on the main issue, on reckless disregard for the truth of the claims. Yes, Your Honor, and that question goes to whether, as the district court. Sorry, go ahead. As the district court said, whether even a cursory glance at these patient files, which dynamic visions in its answers to the interrogatories at 68-1, page 17, described as containing only a few documents that are self-explanatory, whether it would have been obvious to the people tasked with sending out services and billing Medicaid for them. And there's no doubt the government has a very strong case on that issue. But you also have the burden of proof, and we're up on summary judgment. And I can't think of a lot of cases where a party with the burden of proof has been granted summary judgment on a question like intent. Yes, Your Honor. In fact, in this court's case in Kryzik, this case is very similar to this court's case in Kryzik. That's also a Medicaid case. That's a case where the court that was on summary judgment using sampling, and there this court held at page 942 that both, so in that case it was like this company, a small company. So in this company, it's seven employees responsible for this. That's at page 14 of the answers to their interrogatories. In Kryzik, it was two people who were involved, so the court found that at summary judgment it was appropriate to find both that the physician who had delegated all billing responsibilities to his wife and didn't even glance at the bills to make sure that they were accurate, that that was appropriate to find at summary judgment, that he had the requisite center, and also his wife who didn't do any checks before sending out the billing. And that's exactly what we have here. And I think it's really important to step back and discuss exactly how easy it would have been for these seven people who are tasked with ensuring that the reimbursements are only where the plans of care back up those services, how easy it would be to look. So for example, you look in a patient file that's only a couple of documents, there's absolutely no plan of care. That's true for 55% of the people for whom damages were sought. You look at a plan of care, you flip to the signature page, there's a blank signature. The right person never signed off on that plan of care. That's true for 35% of the patients for whom damages were sought. So 55% no plan, not... For certain periods of time. So it's a little bit complicated because... Over the sufficiency of the plan, just no plan at all. There's no plan at all. Okay. And again, I do just want to clarify there that the percentages will end up adding up to more than 100%, but that's because certain patients for different periods of time have different problems. So similarly, it's really easy to look at a plan of care and say, look at the date next to the signature and say, was this done in the right period of time? And that's really important because you can't look at a patient six months later and say, that's why you have to re-up these every six months and say they probably needed these services earlier. And so when you have that type of evidence, and again, it's for 80% of the patients were exactly squarely within CRYSIC. What 80%? What are you covering within the 80%? Sorry. So the 80% is of the 25 patients that were originally investigated, and all of the damages are drawn directly from those 25 patients, so there's no extrapolation being done here. For 80% of those patients, there was not, at various points, there were not valid plans of care backing up the services that were built to DC Medicaid. So there's 55% where there's no plan of care at all? Of those for whom damages were sought. So 55% of the 80%. And then the 55 to 80, the delta between the 35 is? So I can also break it down into numbers. So there are 11 patients for whom there are no valid plans of care at all. There are seven patients for whom there are blank physician signature boxes. Three with untimely signatures. Six with plans of care that, for example, said this person needs five days of services, but seven days of services were funded. So it goes beyond what's covered by the plan of care. Exactly. And how many were alleged forgeries? There are three patients. It's a really small proportion of the total damages. So there are three patients for whom the district court found that there were forgeries. But also one of those patients, almost half of the claims for which damages were sought were actually because of an untimely plan and not the forgery. And what is the evidentiary link that establishes that Dynamic Visions was responsible for that forgery? The affidavits from the doctors don't say anything about that. All they say is, it's not mine, I didn't authorize anybody to sign for me. How do we get from there to tagging Dynamic Visions with that? Your Honor, what the district court did here and what the government thinks is entirely appropriate to do here is in the face of knowing that there were these affidavits where the doctor said, these signatures are forged, they're not mine, they're not by anybody who's authorized to sign for me. And the government sent out interrogatories and said, show us valid plans of care. And Dynamic Visions knew that there were these forgeries. Dynamic Visions came up with absolutely no evidence on summary judgment in response to that to say, this wasn't us. There's a speculative statement by Mr. Bongaman in an affidavit that just says, no, Dynamic Visions wouldn't have done this. Although they identified the seven people that would have been responsible for these things. I don't think it said wouldn't have done. It said didn't do, right? Didn't do. Which is a little bit different. I apologize, Your Honor, I didn't mean to interject. Oh, yeah, no, I wasn't suggesting you did something intentional. I'm just saying that there is a difference between saying, this is not the type of thing we would have done, to saying, as a matter of fact, we didn't do this. Yes, Your Honor, but under this court's standards, which is similar to the standards in all the other courts of appeal, where the only counter evidence is this kind of speculative assertion that's on information and belief, because Mr. Bongaman cannot, I mean, he could speak for himself in writing that affidavit, but he could not speak on behalf of the other six employees tasked with these duties as they identified in their answers to the interrogatories. So the doctors say, we didn't sign. Mr. Bongram says he didn't sign. And then who signed? Well, maybe it was someone else at the company. Maybe it was someone in the doctor's office who knowingly or unknowingly thought she had authority to sign the thing and send it over to the provider. I mean, that doesn't seem, again, back to my summary judgment point, that doesn't seem like one on which the party with the burden of proof would get summary judgment. Well, we disagree in this context because of the litigation history and the fact that defendants were well aware that these were the allegations and that this was the evidence, and they didn't come up with any competent or admissible evidence to the contrary. We do think that it was appropriate for the district court to assess damages based on these forgeries as well. I did just want to step back to emphasize again that the percentage of these forgeries, if this court disagrees, is a relatively small percentage of the overall damages that were sought. Can I ask one question about the forgery? So I take your point that it's a small percentage. It still would be something that we sent back and the district court would sort through, presumably. And you guys would decide whether you want to proceed on the forgery ones, obviously. Yes, Your Honor. If this court disagreed that the burden of proof was met with respect to the forgery. But that would leave entirely intact all of the other damages, which were, in fact, decided in an entirely separate liability decision by the district court. So one fact that was interesting to me just at a macro level is that there's ones as to which there's allegedly forged signatures, and then there's ones that were left blank with no signature. Yes, Your Honor. So when you juxtapose those, it seems like it's a little bit more difficult to reach the conclusion that there was a forged signature when the company, even under the government's argument, thought that it would be okay not to have a signature at all. So, sorry, I do just want to clarify that the company did not think that it was fine to have a blank signature, and this is why they understood that they did have to have signatures. So there's an example. Okay. They didn't think it was okay. I take your point. But there are at least circumstances in which there was no effort to forge a signature. You have the plans of care in which there was no signature at all, right? Yes, Your Honor. And so with those, it just seems a little odd then to lead to the assumption that where there is a signature, it's forged, because at least for some, even under your estimation, there wasn't a signature at all. So the inference that the signatures were – I apologize. I really don't want to say inference here. We know, and it's undisputed, that the signatures were forged, and then the only question is whether or not Dynamic Vision's employees were responsible for those forgeries. And here it's our position that in accordance with what the district court found, where the United States presented this evidence that the signatures were forged and that the doctors were saying, listen, nobody in my office was authorized to sign on my behalf, that where Dynamic Vision's didn't meet its burden under summary judgment to come forward with competent evidence saying, no, it was not one of our folks. And there are, as Your Honor points out, there are things in the record in which there are blank signature blocks. So it would be possible for a Dynamic Vision's employee to do so, that that burden is satisfied. And I apologize. I see that my time has expired, but if there are more. Okay. Thank you very much. Thank you very much. We'll give you back one minute for rebuttal. Okay. All right. Your Honor, one of the facts about what counsel is arguing in terms of trying to downplay the number or increase the percentage is part of the issue in this case was the amendment that was done by the district court. While the district court called it a typographical error as to numbers, but they play a significant part in this case, the reason being that the defense may rely on the mistake of the plaintiff in order to defend their case. So by not coming up and telling you what your mistake is, the counsel who's bringing the case to the court has the burden and was required to present the case to the court in the fashion it's supposed to be. Like one of the numbers I cited in my reply brief jumped from 1,000 for something to 53,000. So it becomes significant in the sense that, okay, it's not only the forged plans of care. There were other things because they had a different number. So it was impossible or at least difficult for the appellant to determine who we're talking about to be able to present anything at that point. So the court, by going forward and granting summary judgment, even though there were classifications, there were mistakes in everything that they presented, was clearly, you know, an error on the part of the district court. Thank you very much. We have your argument. The case is submitted.
judges: Griffith, Srinivasan, Katsas